UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMY JORGENSEN
f/k/a AMY GOMEZ,

    Plaintiff,

v.

HENRY FORD HEALTH SYSTEM,

    Defendant.

Case No. 16-13389
Honorable Laurie J. Michelson
Magistrate Judge Elizabeth A. Stafford

**OPINION AND ORDER GRANTING
IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [24]**

After a lengthy career at Henry Ford Health System, Amy Gomez (now Amy Jorgenson) was fired in 2016. Gomez says she was fired because of her race, her age, her daughter's disability, and for exercising her rights under the Family Medical Leave Act. So she sued the Henry Ford Health System, bringing a host of federal and state claims. In time, the hospital system moved for summary judgment on all but one of the claims. And Henry Ford says Gomez was fired for repeatedly failing to live up to the system's code of conduct for nursing staff.

Casting the record in the light most favorable to Gomez, no reasonable jury could find in her favor on any of her claims. So the Court grants Henry Ford's motion.

**I.**

The following narrative views the facts and all inferences drawn from them in the light most favorable to Gomez. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In 1988, Amy Gomez began her career with Henry Ford Health System. She started out as an Executive Secretary for the Health Alliance Plan. (R. 26, PageID.464.) Eventually, Gomez obtained a nursing degree and transitioned to work as a registered nurse. (R. 26, PageID.465; R. 24, PageID.242.) From 1997 to 2016, she worked as a registered nurse for the system in various capacities and at various locations. (R. 24, PageID.242.) And in 2011, she began her last position in the health system as a triage nurse at the Henry Ford Women's Health Clinic in Dearborn, Michigan. (*Id.*)

Nurses at the Dearborn Women's Health Clinic are held to high expectations. (R. 24-4.) Broadly speaking, the clinic's nurses provide "leadership in the coordination and delivery of quality compassionate patient care." (R. 24, PageID.244.) Quality and compassionate patient care requires registered nurses to, among other things, conduct physical and psycho-social assessments of patients, review lab data, develop treatment plans, triage patient needs via phone or in-person contacts, and collaborate with other parts of the hospital when necessary. (R. 24, PageID.244–245.) And when interfacing with patients, registered nurses "[m]ust meet or exceed core customer service responsibilities, standards, and behaviors" including "sensitivity" and "understanding." (R. 24, PageID.246; *see also* R. 24-10.)

All agree that a few years into her tenure at the Women's Health Clinic, Gomez started having trouble meeting the clinic's expectations. (R. 26, PageID.434, 465, 467, 468.) In February 2014, Gomez received a "written warning" for "losing her cool." (R. 24, PageID.313; *see also* R. 24, PageID.330.) Gomez "lost her cool" after her supervisor, Venecca Thornhill, reprimanded her for refusing to give an injection when asked to do so. (R. 26, PageID.476.) According to the written warning, Gomez got upset and swore at Thornhill. (R. 24, PageID. 252.)

2

After Gomez lost her cool, another supervisor, Joann Quaine, remembers speaking with Gomez about the incident. Quaine remembers Gomez admitting that she caused a disruption when Thornhill reprimanded her. (R. 24, PageID.330.) And Quaine remembers Gomez admitted to using profane language. (*Id*.)

Gomez sees the incident in a different light. She says she was not the injection nurse on duty that day. (R. 26, PageID.476; R. 24, PageID.252.) Yet when a patient arrived in need of an injection, Gomez remembers being asked to provide it. (R. 26, PageID.477.) But Gomez was overseeing the phones and did not want to leave them unattended for the 20 minutes it would take to complete an injection. (R. 26, PageID.477–478.) So Gomez asked for help to cover the phones. (R. 26, PageID.476–477.) But help never arrived, so the patient had to wait until Gomez got around to giving the injection. (R. 26, PageID.476–477.) Ultimately, making the patient wait led Thornhill to reprimand Gomez. (R. 26, PageID.476.) Gomez remembers being "very upset" with Thornhill and "might have been loud." (R. 26, PageID.479.) And Gomez felt that Thornhill had picked on her because another nurse, who was not present at the time, should have been reprimanded instead. (R. 24, PageID.476.) But Gomez says she never swore at Thornhill. (R. 26, PageID.479.) In all, Gomez sees the incident as evidence of Thornhill's "targeting." (R. 24, PageID.476.)

Nevertheless, Gomez received a written warning. (R. 24, PageID.252.) Thornhill considered the incident a "Group 2 violation." (*Id.*) A Group 2 violation refers to a component of the health system's discipline process—known internally as the Corrective Action Program. (R. 24-13.)

The Corrective Action Program is designed to curb "unacceptable work performance or behavior and provid[e] an official record of [the system's] attempts" to do so. (R. 24, PageID.319.) The system is "generally progressive" but reserves to supervisors "the exclusive right to determine

3

the appropriate corrective action" depending on the "circumstances of each case." (R. 24, PageID.320, 323; *see also* R. 24, PageID.314.) Corrective actions can include "documented counseling," or a "written warning," or a "written warning with suspension," or, possibly, "termination." (R. 24, PageID.321–322.) Generally, Group 1 violations are less serious violations of the system's standards—things like tardiness or a failure to follow call-in procedures. (R. 24, PageID.323.) But Group 2 violations are considered "very serious" and may result in "suspension or termination" without first resorting to less drastic measures. (R. 24, PageID.321, 323.)

For about a year after the February 2014 written warning, Gomez showed improvement. Indeed, by the end of 2014, Thornhill rated Gomez as "fully successful in displaying a positive attitude." (R. 24, PageID.252.) And Thornhill noted that Gomez worked hard to improve interactions with co-workers. (*Id.*)

But in 2015, complaints about Gomez resurfaced. (R. 24, PageID.253.) In March, Thornhill noted a complaint from Lisa Jones, the contact center supervisor. (R. 24-19.) According to the note, Jones said Gomez was being "very rude and short with the contact center advocates." (R. 24, PageID.335.)

Jones' team members continued to complain about Gomez. (R. 24, PageID.346; R. 24-22.) On June 9, Jones emailed Thornhill to say contact center staff were complaining about Gomez being "nasty again." (R. 24, PageID.346.) And when Jones spoke with Gomez about her attitude, Jones remembers Gomez reacting with a "short, elevated tone of voice" over the phone. (R. 24, PageID.341.)

Thornhill documented the June 9 complaint. (R. 24-22.) Her notes indicate she discussed the "inappropriate behavior" with Gomez, and Gomez "verbalized understanding" that she needed

to "follow the team member standards of excellence with every internal and external customer[]."(R. 24, PageID.347.)

And yet, the next day, Thornhill received another complaint about Gomez. According to Thornhill's notes, Sarah Chami, a Clinic Service Representative, encountered a patient sobbing in a hallway. (R. 24, PageID.348, 351.) Thornhill's supervisor, Mary Finn, spoke with Chami and learned more about the incident. (R. 24, PageID.351.) Chami said the patient was 38 weeks pregnant and went to the clinic concerned about abdominal pains. (*Id.*) But she did not have an appointment. (*Id.*) And because the patient did not have an appointment, Gomez turned her away without evaluating her and without booking one. (*Id.*) So the woman abruptly left the clinic, and went to a different hospital, where she gave birth.[1] (*Id.*)

Finn remembers immediately thinking Gomez's behavior created "a significant patient safety concern." (R. 24, PageID.351.) And although the incident is not formally documented, she recalls that the incident led to a "written action" against Gomez. (*Id.*) Finn also started to craft an intervention plan to help Gomez keep her job. (R. 24, PageID.358.) And after the incident, Finn and Thornhill reached out to another supervisor, Michelle Aarons-Jackson. (R. 24-25; R. 24, PageID.358.) Aarons-Jackson felt that Gomez needed "a discipline as well as some type of customer service class." (R. 24, PageID.362.) She made clear that the hospital "just cannot tolerate this type of bad customer service." (*Id.*)

---

[1] Gomez urges the Court to disregard Finn's recollection of Chami's encounter with the patient. (R. 26, PageID.440–441.) Gomez says Finn's testimony about what Chami told her is hearsay. (*Id.*) But, as Henry Ford rightly argues, it does not offer Finn's recollection of Chami's conversation to prove that Gomez actually turned a pregnant woman away. (R. 27, PageID.622.) Rather, they offer it to show its effect on Finn, namely why she came to believe Gomez posed a problem for patient safety. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009). The same goes for Gomez's hearsay argument with respect to Jones' deposition testimony.

Thornhill documented Gomez's issues with staff and customers in Gomez's mid-year evaluation. (R. 24-39.) Thornhill indicated that Gomez struggled with challenging patients or problems and noted that Gomez did not "empathize" with customers. (R. 24, PageID.394.) And Gomez did not meet expectations when it came to "Displaying a Positive Attitude/Take Pride in the System." (R. 24, PageID.392.) Gomez also struggled to "Commit to Team Members." (*Id.*) Thornhill commented that Gomez needed to "communicate more openly" and take steps to make her team members' jobs less difficult. (*Id.*)

In the latter of half of 2015, complaints about Gomez continued. In September 2015, a hospital employee accompanied her pregnant cousin to the clinic. (R. 24, PageID.366.) The employee's cousin wanted to see her doctor, but her doctor was unavailable. (*Id.*) So the pair saw Gomez. (*Id.*) During Gomez's evaluation, the hospital employee believed Gomez was rude to the patient, never asked the patient if she had any questions, and did not make the patient comfortable enough to ask questions. (R. 24, PageID.366.) And when Gomez eventually did book an appointment for the employee's cousin, it was not with the patient's doctor. (*Id.*) So the hospital employee emailed a complaint to Thornhill. (R. 24-28.)

Thornhill received the complaint and emailed her supervisor. (R. 24-29.) Thornhill's email to Finn says she discussed the incident with Gomez, and Gomez acted rudely. (R. 24, PageID.367.) Gomez felt the patient was just upset because the patient could not see her doctor. (*Id.*) And Thornhill's email says Gomez threatened to quit if she was disciplined for the complaint. (*Id.*) The email indicates Gomez said she hated her job, anyway, and wanted out of the department. (*Id.*)

Finn forwarded the email to Anita Yaeger, another supervisor. (R. 24, PageID.367.) Yaeger recognized the severity of the complaint. (R. 24, PageID.316.) And she recognized that Gomez's behavior toward patients was starting to show a troubling pattern. (R. 24, PageID.317.) So Yaeger,

6

Thornhill, and Finn started to discuss appropriate responses to Gomez's behavior. (R. 24, PageID.317.)

The September complaint, combined with the June incident, led Gomez to receive another Corrective Action. (R. 24-27.) Gomez received a written warning for a Group 1 violation. (R. 24, PageID.365.) The written warning indicates Gomez "displayed a poor attitude when providing care of a patient during an OB intake." (*Id.*) As a next step, Gomez was required to attend the service excellence and assessment training (SEAT) program.

Finn recommended the SEAT program. (R. 24, PageID.358.) Already planning an intervention after the June incident, when Finn learned of the September complaint (R. 24, PageID.356), she remembers thinking that the hospital needed to be proactive (R. 24, PageID.352). Finn explains the SEAT program as a "penalty-free" way for an employee to get a "wake-up call" by participating in a "small group intervention." (*Id.*) She recognized Gomez's behavior amounted to a "problematic pattern that would lead to termination" and potentially even the loss of Gomez's license. (*Id.*) Finn recommended SEAT because "anyone who had a license and turned away a patient in crisis needed a SEAT Program referral . . . if they kept their job at all." (R. 24, PageID.358.)

Pam Theisen ran the SEAT program. (R. 24, PageID.352.) After Gomez completed the training, Theisen provided Finn and Thornhill with a written report. (R. 24, PageID.352.) The report says Gomez expressed only "average" job satisfaction and admitted to not always having the "most positive" attitude. (R. 24, PageID.377.) Gomez also agreed to work on her accountability in the workplace, meaning she would strive to take responsibility for her actions and "stop blaming." (*Id.*) And in a section of the report for supervisors only, Theisen rated Gomez's "Self-Awareness" as "weak to average," indicating Gomez did not fully appreciate the impact of her

7

behavior. (R. 24, PageID.381.) Similarly, Theisen rated Gomez's "Accountability Attitude" as "Weak (no acknowledgment of need or desire to do anything differently)." (*Id.*) Finally, Theisen indicated Gomez presented as having a weak "Motivation for Improvement" and had a strong need for coaching. (*Id.*)

Also in the supervisor's-eyes-only portion, Theisen said Gomez was dealing with some "heavy personal issues" contributing to her poor attitude at work. (R. 24, PageID.380.) In her deposition Gomez explained that, at some point between 2014 and 2015, her daughter, who has autism, started requiring more care. (R. 26, PageID.466, 471, 472.) Gomez's daughter had been removed from the mainstream classroom and placed in a new school. (R. 24, PageID.218.) The new school meant Gomez's daughter had to take a bus, and the bus required Gomez to be at home between 7:45 and 8:00 am to help her daughter board. (R. 24, PageID.232.) But some days her daughter's condition made riding the bus especially difficult. (*Id.*) So Gomez had to drive her daughter to school; and, as a result, Gomez was often late for work. (*Id.*)

Initially, Gomez asked Thornhill for an accommodation. (R. 24, PageID.250.) She wanted to start her morning shift later. (R. 26, PageID.471; R. 24, PageID.250.) And Thornhill obliged. (R. 24, PageID.250; R.24-7.) Thornhill explained that nursing shifts start at 8:00, 8:30, and 9:00 am and Thornhill allowed Gomez to schedule 8:30 and 9:00 am start times. (R. 24, PageID.250–251.) Gomez could not choose a regular 9:00 am start time as it would have been too disruptive for the clinic. (R. 24, PageID.251.)

However, even after Gomez was allowed to start later, she still arrived tardy. (R. 24, PageID.223, 251.) Thornhill says Gomez never blamed the tardies on her daughter and instead offered a litany of excuses: traffic, lost keys, etc. (R. 24, PageID.251, 259.) For her part, Gomez insists she told Thornhill every tardy was due to her daughter's condition. (R. 26, PageID.473; R.

8

24, PageID.223.) Regardless, all agree that the hospital system's attendance policy did not tolerate tardiness: it could lead to a Corrective Action. (R. 24, PageID.223–224, 250, 279.) So Thornhill warned Gomez about accumulating tardies. (R. 24, PageID.256.)

But Gomez continued to show up late. So Thornhill issued a Correction Action. (R. 24, PageID.257–258; R.24-33.) In early November, Gomez received a written warning with a three-day suspension. (R.24-33.) Finn was present when Gomez received the suspension (R. 24, PageID.353.) Finn recalls Gomez "refused to discuss the situation" and stormed out of the room, saying "she had a dinner party to get to." (*Id.*) Finn was "stunned." (*Id.*) She recalls thinking Gomez's response was "very unusual" for a "licensed professional" and evidence that Gomez was "refusing to follow through on the recommendations from the SEAT program." (*Id.*) All in all, Finn was "concerned about the likelihood of [Gomez] being able to turn her problem around." (*Id.*) So Finn and Thornhill communicated with Yaeger and agreed that if Gomez wanted to pursue any further interventions to improve her performance, she would be accommodated. (*Id.*)

Concerned about the effect her tardies were having on her work performance (R. 24, PageID.231–233), after returning from suspension, Gomez submitted paperwork for intermittent leave under the Family and Medical Leave Act (R. 24-34). Gomez submitted the request based on her need to care for her daughter. (R. 24, PageID.232.) The health system granted it, and the leave period began November 20, 2015. (R. 24, PageID.385.) Gomez took the leave, at least twice, when she needed it to care for her daughter and prevent tardies. (R. 24, PageID.233.)

Meanwhile, Gomez's customer service issues persisted. On December 3, 2015, a father accompanied his 13-year-old daughter to the clinic for a pregnancy test. (R. 24, PageID.387.) The father wanted to schedule an appointment, but Gomez was "rude, showed no empathy, had a negative demeanor and was inappropriate and did not help him obtain an appointment for his

9

daughter." (*Id.*) Then, on December 14, a pregnant patient and her husband complained about Gomez's "cold and not compassionate" care when they asked Gomez to explain genetic testing results. (*Id.*; R.24-38.) Gomez never did so, and the couple left the clinic concerned about their results. (*Id.* R. 24-38.)

The December complaints were the last straw. After the SEAT intervention, multiple Corrective Actions and a suspension for tardiness, Thornhill, Finn, and Yaeger decided Gomez was not a fit for the health system. (R. 24, PageID.263, 317, 359–360.) So in late December 2015, Thornhill wrote a final corrective action recommending termination. (R. 24-35.) Yaeger, Finn, and Thornhill were all present when Gomez was officially fired in January 2016. (R. 24, PageID.359–360, 387.)

Soon after, Gomez sued Henry Ford Health System. (R. 1.) After two rounds of amendments (R. 6; R. 18), Gomez's complaint alleged ADA, Title VII, FMLA, and state law claims (R. 18, PageID.132–137). Following discovery, the health system moved for summary judgment on all but one of them. (R. 24.)

**II.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

**III.**

Gomez brings Title VII, FMLA, ADA, and state law claims against the Henry Ford Health System. She attributes her adverse employment actions to Venecca Thornhill's racial and age animus, refusal to accommodate, and interference with Gomez's rights under the FMLA. (R. 26, PageID.434–435, 465, 467.) In response, Henry Ford Health says Gomez got the FMLA leave to

which she was entitled, got the reasonable accommodation she asked for, and was fired because of her poor work performance, not her race. (R. 24, PageID.180–181.)

As Gomez raises a host of claims and the Henry Ford offers independent arguments for rejecting each one, the Court will separately address each of the claims.

## A.

Gomez says Henry Ford Health System both interfered with her rights under the FMLA and retaliated against her for exercising her rights under the act. (R. 18, PageID.134–135.) The FMLA entitles eligible employees to as much as "12 workweeks of leave during any 12-month period" to care for a child with a "serious health condition." 29 U.S.C. § 2612(a)(1)(C). And the Sixth Circuit "recognizes two distinct theories for recovery under the statute: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Festerman v. Cty. of Wayne*, 611 F. App'x 310, 314 (6th Cir. 2015) (quoting *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). Under either theory, absent direct evidence, the Sixth Circuit applies the *McDonnell Douglas* burden-shifting framework. *See Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (applying this framework in the FMLA retaliation context); *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (applying this framework in the FMLA interference context).

Gomez asserts both theories. Gomez says she needed the intermittent FMLA leave to care for her special-needs daughter. Gomez says the hospital system should have provided leave the moment Gomez told them about her daughter. And, adds Gomez, when she finally did get leave, Thornhill started targeting her even more.

But the Henry Ford says Gomez's request for intermittent FMLA leave was granted and points out Gomez admits she had no issues taking intermittent leave. (R. 24, PageID.199–200.)

Plus, Henry Ford says Gomez was fired for her poor performance, so on her retaliation claim, she cannot establish a causal link between taking FMLA leave and her termination. (R. 24, PageID.201–202.)

1.

Starting with Gomez's interference claim, in order to establish her prima facie case, she must show: (1) she was an eligible employee, (2) Henry Ford Health System is an "employer" under the FMLA, (3) she was entitled to leave, (4) she gave her employer notice of her intention to take leave, and (5) Henry Ford Health System denied the leave. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016) (citation omitted).

The parties do not dispute any of the first three elements, and all agree the Henry Ford granted Gomez's FMLA request. (R. 24-34; R. 24, PageID.233, 237.) So the only dispute is over the fourth element, notice. Gomez says she told Thornhill about her special-needs daughter long before her three-day suspension for tardiness. (R. 24, PageID.449.) And, in Gomez's view, telling Thornhill her tardies were the result of caring for her special-needs daughter, was legally sufficient "notice of her intention to take leave." And so, Gomez concludes, she had placed the ball in Henry Ford's court to tell her about the availability of FMLA leave. (R. 24, PageID.449.)

Gomez mistakenly relies on *Wallace v. FedEx Corp.* 764 F.3d 571, 586 (6th Cir. 2014). True, *Wallace* does say that an employee gives "sufficient notice that [s]he is requesting leave for an FMLA-qualifying condition when [s]he gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA § [2612(a)(1)] has occurred." *Wallace*, 764 F.3d at 586 (internal citations omitted). But *Wallace* draws the above holding from 29 C.F.R. § 825.302(c), one of the FMLA's implementing regulations. *See id.* (citing the regulation). And by the time of the events in Gomez's case, the regulation had changed. *See*

12

*Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 614–15 (6th Cir. 2013); *see also* 73 Fed. Reg. 67934, 68099; 29 C.F.R. § 825.302(d).

The regulation in place at the time of these events says, in part, "[a]n employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.302(d). And where an employee fails to comply, again absent "unusual circumstances", "FMLA-protected leave may be delayed or denied." *Id.* According to the Sixth Circuit, the changed regulation expressly "permits employers to condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances." *Srouder*, 725 F.3d at 614. Thus, to provide "notice of her intention to take leave," Gomez must show that at some point prior to November 2015 she complied with the Henry Ford's "usual and customary notice and procedural requirements" for requesting FMLA leave. *See Srouder*, 725 F.3d at 615. And if she did not comply with the usual process, and does not point to any unusual circumstances, then Henry Ford did not interfere with Gomez's rights under the FMLA by waiting until Gomez followed the required process. *Srouder*, 725 F.3d at 615; *see also* 29 C.F.R. § 825.302(d).[2]

Gomez did not comply with Henry Ford's procedure. Accepting her account, Gomez says every time she was late she told Thornhill it was because of her daughter's special needs. But Gomez knew about Henry Ford's attendance policy. (R. 24, PageID.224.) And the attendance

---

[2] To be sure, § 825.302 governs only instances of foreseeable leave. Yet neither party addresses whether Gomez's leave would have qualified as foreseeable or unforeseeable. However, the regulation governing unforeseeable leave is even stricter: to provide notice of unforeseeable FMLA-leave "an employee *must* comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.303(c) (emphasis added). So the issue remains whether Gomez complied with Henry Ford's procedure.

policy explicitly directs employees to "HR Policy 7.02, Leave of Absence, for further details on filing a FMLA claim." (R. 24, PageID.278.) HR Policy 7.02, in turn, says that Gomez was to provide 30-days' notice for foreseeable leave, less for unforeseeable leave. (*Id.* at PageID.292.) Then she had to check in with a supervisor or timekeeper. (*Id.*) And finally, she was to contact CIGNA, the company's FMLA administrator, and speak with a Customer Intake Representative. (*Id.*) CIGNA would follow up with her. (*Id.*) Yet Gomez does not point to anything in the record indicating she complied with the above procedures at any time prior to her November 2015 leave request. Nor does Gomez argue any "unusual circumstances" excuse her from compliance. *See* 29 C.F.R. § 825.302(d).

At bottom, Gomez first provided "notice of her intention to take leave" when she applied for FMLA leave in November 2015. And, at that point, all agree the company granted the leave request. So Henry Ford did not interfere with Gomez's FMLA rights by waiting for her to use the "usual and customary procedure." *See Srouder*, 725 F.3d at 615. As Gomez cannot establish a prima facie case, no reasonable jury could find for her on the FMLA-interference claim.

## 2.

The Court thus turns to Gomez's retaliation claim. To make out an FMLA retaliation claim, Gomez shoulders the initial burden: (1) her activity must have been protected by the FMLA, (2) Henry Ford Health must have known she was exercising her rights, (3) Henry Ford must have taken an adverse action against her, and (4) there needed to be a causal link between the protected activity and the adverse action. *See Donald*, 667 F.3d at 761 (citation omitted).

The only element at issue is causation. Gomez says Thornhill started targeting her after she applied for FMLA leave. (R. 26, PageID.451.) And Gomez was fired roughly one month after receiving FMLA leave. (R. 26, PageID.451–452.) But Henry Ford says that what Gomez views as

14

targeting was in fact write-ups for poor work performance and failures to live up to the code of conduct. (R. 26, PageID.201–202.) Even more, the hospital says Gomez cannot show temporal proximity. (*Id.*)

Even at the prima facie stage, Gomez's retaliation claim is a close call. True, Gomez's workplace conduct led to disciplinary actions. (*See, e.g.*, R. 24-14, 24-19, 24-25, 24-27, 24-32, 24-33, 24-35.) But, giving Gomez every benefit of the doubt, she says she was fired roughly one to two months after requesting and receiving FMLA leave. And recent Sixth Circuit case law does suggest that one to two months temporal proximity between FMLA leave and adverse action might be enough to show causation at the prima facie stage. *Stein v. Atlas Indus.*, 730 F. App'x 313, 319 (6th Cir. 2018) (holding that any period less than ten weeks is sufficient); *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 409 (6th Cir. 2014) (citation omitted) (two- to three-month timeframe is sufficient). So the Court will assume, for the sake of argument, Gomez can establish a prima facie case.

The burden thus shifts to Henry Ford to show a legitimate, non-discriminatory or non-retaliatory basis for the termination. *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 445 (6th Cir. 2018). And Henry Ford discharges its burden. Henry Ford says Gomez was fired for her workplace conduct and points to her numerous Corrective Actions. (R. 24, PageID.204.) And the evidence of record would permit a reasonable jury to credit this explanation.

That finding means that Gomez must identify evidence that would allow a reasonable jury to find that her poor conduct was not the real reason for the write-ups and termination but instead a pretext for retaliation. This, Gomez has not done. For one, Gomez started to receive Corrective Actions in February 2014, more than a year before she applied for FMLA leave. (R. 24-14.) And the Corrective Actions continued through late 2015. (R. 24-27, 24-33, 24-35.)

More than anything, Gomez was disciplined for her attitude toward coworkers and the patient complaints. (R. 24, PageID.356.) And while Gomez quibbles with the semantics of some of the patient complaints, she admits patients complained and admits she, at times, lacked empathy. (*See, e.g.*, R. 26, PageID.486, 487.) Yet the system's code of conduct for nurses required Gomez show patients understanding and sensitivity. (R. 24, PageID.246; *see also* R. 24-10.) And Gomez, admittedly, (R. 26, PageID.486), struggled with that expectation (*see, e.g.*, R. 24-39, 24-32; R. 24, PageID.394). So much so that Finn, her supervisor, believed Gomez's attitude generated patient safety concerns. (R. 24, PageID.356, 358.) And Finn believed termination was a distinct possibility given Gomez's behavior. (R. 24, PageID.358.) So the record amply supports that Gomez was fired for her poor workplace conduct.

Gomez tries to argue her workplace conduct was "not the actual reason" she was fired. *Donald*, 667 F.3d at 762. Gomez believes her termination would not have occurred but for her suspension. And her suspension was a product of tardiness caused by FMLA-protected activity. (R. 24, PageID.223–224; R. 26, PageID.453.) However, Gomez offers a far too rigid assessment of the Corrective Action policy. (R. 24, PageID.317.) And ignores the fact that her supervisors were most concerned about her attitude toward patients. (R. 24, PageID.356, 358.) Moreover, even if Gomez was late because she was caring for her daughter, as discussed earlier, she never followed Henry Ford's FMLA leave policy prior to her suspension. Thus, when Henry Ford disciplined her for tardiness, they were enforcing their "usual and customary" leave procedures, *see Srouder*, 725 F.3d at 615, procedures Gomez knew about (R. 24, PageID.225). So Gomez cannot show Henry Ford actually fired her because she exercised her rights under the FMLA.

At bottom, Gomez cannot succeed on her FMLA retaliation claim. Henry Ford says they fired Gomez because of her workplace conduct. And even viewing the record in the light most favorable to Gomez, no reasonable jury could find Henry Ford's reason was pretextual.

**B.**

Gomez also brings a Title VII claim against the hospital system, alleging two distinct theories of discrimination. Gomez blames her termination on Thornhill's race and age-based animus. In response, Henry Ford Health says Title VII does not prohibit age discrimination and Gomez cannot establish that she was terminated "because of" her race. The Court agrees.

There is no claim for age discrimination under Title VII. *See Clark v. City of Dublin*, 178 F. App'x 522, 524 (6th Cir. 2006) (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 n. 4 (2006)). And Plaintiff did not raise nor do the parties brief the AEDA.

Although a race discrimination claim under Title VII does exist, it is not viable in this case. Problematically, neither Gomez's complaint nor her summary judgment briefing indicate her race. The complaint says only that Gomez is entitled to Title VII protections because she is "a different race of her manager." (R. 18, PageID.136.) Only by reviewing her deposition testimony does the Court learn that Gomez is white. (R. 24, PageID.217; R. 26, PageID.492.) And Venecca Thornhill is African American. (R. 24, PageID.217.) So Gomez brings a reverse discrimination claim.

As Gomez has no direct evidence of discrimination, she must rely on the *McDonnel Douglas* burden-shifting framework. *See Carey v. Foley & Lardner LLP*, 577 F. App'x 573, 580–81 (6th Cir. 2014). Initially, Gomez bears the burden of establishing a prima facie case of discrimination. *Id.* Additionally, as part of her prima facie case for reverse discrimination, Gomez must show "background circumstances to support the suspicion that [Henry Ford] is the unusual

employer who discriminates against the majority." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002).

Gomez makes no attempt to do so. Nor could she make this showing. At least two of her supervisors—Joanne Quaine and Mary Finn—were white women. (R. 24, PageID.228, 235.) And some of her coworkers among the nursing staff were white. (R. 24, PageID.219.) The fact that Henry Ford hired and promoted white people cuts against Gomez's reverse-discrimination claim. *See Briggs v. Potter*, 463 F.3d 507, 517 (6th Cir. 2006). Even more, Gomez has not offered any background circumstances suggesting Henry Ford "is the unusual employer who discriminates against" the majority. *See Briggs v. Potter*, 463 F.3d at 517. Added together, Gomez has not produced "a shred of evidence" to make out a prima facie case of reverse discrimination. *See. Briggs*, 463 F.3d at 517; *Yeager v. GMC*, 265 F.3d 389, 397 (6th Cir. 2001). Additionally, for the reasons set forth above, Henry Ford Health has also offered legitimate, non-discriminatory, non-pretextual reasons for Gomez's termination. No reasonable jury could find for Gomez on her claim of race discrimination.

## C.

Finally, Gomez alleges the Henry Ford failed to offer her a reasonable accommodation as required by the Americans with Disabilities Act and its Michigan counterpart. (R. 18, PageID.132–137.) This is the extent of her argument:

> Defendant claims that it accommodated Plaintiff under the Americans with Disabilities Act by accommodating a request to her schedule. However, as discussed *Supra*, only allowing Plaintiff to delay her start time on some occasions to 8:30 [was not] an adequate accommodation, since Plaintiff still encountered issues with her schedule, ultimately resulting in a Written Warning with Suspension, and her having to formally request FMLA leave.

(R. 26, PageID.456.)

18

A section of the Americans with Disabilities Act prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). But this provision of the statute does not require employers "to provide reasonable accommodations to non-disabled workers . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011); *see also Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 339 (7th Cir. 2012) (holding an employer need not accommodate an employee on account of the employee's daughter).

Moreover, the Michigan Persons with Disabilities Civil Rights Act does not permit Gomez to state a claim "based on her association with a disabled person." *Elias v. Pitt, McGhee, Palmer, Rivers & Golden, PC*, No. 09-13527, 2010 WL 4683912, at *4 (E.D. Mich. Nov. 10, 2010) (citing Mich. Comp. Laws § 37.1102; § 37.1103(d)(I)).

Thus, to the extent plaintiff seeks a reasonable accommodation due to her daughter's special needs, neither the ADA nor its Michigan equivalent entitle her to one. *See Stansberry*, 651 F.3d at 486; *Elias*, 2010 WL 4683912 at *4. So no reasonable jury could find in her favor on her reasonable accommodation claims.

## D.

What remains then is Gomez's state law claim for age and race discrimination under the Elliott-Larsen Civil Rights Act, alleged in her second amended complaint. (R. 18, PageID.132–133.) And Henry Ford answered. (R. 20, PageID.143.) Yet even on a generous read, it does not appear Henry Ford moved on these ELCRA claims.

But the Court has dismissed all of Gomez's federal claims. And when, as here, the federal claims are dismissed before trial, and only state claims remain, federal courts often decline to

exercise supplemental jurisdiction over the state-law claims. *See, e.g.*, *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). In deciding whether to exercise jurisdiction, the Court's task is to weigh "judicial economy, convenience, fairness, and comity." *Id.*

The factors point to dismissal. True, the parties have completed discovery. But that discovery is still useful in the state courts. Plus, Gomez filed these claims eight months after her termination. ELCRA's statute of limitations gives Gomez three years to file her claim. *See Finnerty v. RadioShack Corp.*, 390 F. App'x 520, 527 n. 1 (6th Cir. 2010) (citing *Garg v. Macomb County Cmty. Mental Health Servs.*, 696 N.W.2d 646, 657–58 (Mich. 2005)). And as the statute of limitations has been stopped during the pendency of this litigation, *see Artis v. District of Columbia*, 138 S.Ct. 594, 598 (2018), she should have no trouble timely re-filing in state court. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state claims.

## IV.

Accordingly, the Court GRANTS Henry Ford Health System's motion for summary judgment. (R. 24.) And the Court declines to exercise supplemental jurisdiction over the remaining state-law claim. So Gomez's complaint (R. 18) is DISMISSED.

SO ORDERED.

Date:   September 30, 2018                    s/Laurie J. Michelson
                                              Hon. Laurie J. Michelson
                                              DISTRICT COURT JUDGE